1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In re MARIA O. SEGOVIA,

          Debtor.

_____/

MARIA O. SEGOVIA,

          Debtor/Appellant,

    v.

E. LYNN SHOENMANN,

          Defendant/Appellee.

_____/

No. C 08-3075 PJH
Bankr. Case No.  06-30387
Adv. Case No. 05-3441

**ORDER AFFIRMING JUDGMENT
OF THE BANKRUPTCY COURT**

      Plaintiff and appellant Maria Segovia ("Segovia") appeals the bankruptcy court's June 9, 2008 decision and order sustaining the chapter 7 trustee's ("trustee") objections to her claimed exemptions and exclusions in an employer compensation plan.  For the reasons that follow, the court AFFIRMS the judgment of the bankruptcy court.

## BACKGROUND

**A.    Factual and Procedural Background**

      On May 16, 2006, Segovia, currently fifty-three years-old, filed a voluntary chapter 7 bankruptcy petition.  Prior to bankruptcy, Segovia worked at Wells Fargo Bank ("Wells Fargo") for more than thirty years.  During that time, Segovia held numerous positions with the bank, from file clerk to corporate finance manager.[1]  On October 5, 2005, the bank notified Segovia that her job as a finance manager would be eliminated as of December 3, 2005.  However, Segovia was placed on continuation of leave of service with Wells Fargo,

---

[1] In a prior March 20, 2008 order, which is not the subject of the appeal here, the bankruptcy court found Segovia to be "a sophisticated businesswoman."

**United States District Court**
For the Northern District of California

1   which lasted until March 3, 2007.  During the fifteen month leave, Segovia received her

2   salary under a salary continuation or severance plan.

3       Throughout the course of her employment at the bank, Segovia received Wells

4   Fargo stock options pursuant to Wells Fargo's Long-Term Incentive Compensation Plan

5   ("LTICP").  Prior to filing for bankruptcy, Segovia exercised stock options granted to her

6   under the LTICP on three occasions, realizing a total of $205,591.63.  She used the

7   proceeds from those three exercises to pay for remodeling and construction costs to a

8   residence that she owned with her sister and mother at 320-322 Maple Street in San

9   Francisco, California.

10      At the time Segovia filed for bankruptcy, she owned additional unexercised stock

11  options under the LTICP.  In addition to the LTICP, Segovia also possessed a formal

12  retirement or 401(k) plan with Wells Fargo worth $772,754.16.

13      In the schedules that Segovia filed with her bankruptcy petition on June 13, 2006,

14  she listed the LTICP stock options as non-exempt personal property.  She did, however,

15  schedule her Wells Fargo 401(k) retirement plan in the amount of $772,754.16 as exempt.

16  Additionally, in schedules that she amended on September 13, 2006, Segovia also

17  scheduled $130,863.75 that she received under the Wells Fargo salary continuation plan

18  as exempt.  On November 30, 2006,  the bankruptcy court subsequently ruled that the

19  funds Segovia received under the salary continuation plan were indeed exempt in spite of

20  the trustee's objection, concluding that the salary continuation plan constituted an ERISA

21  welfare benefit plan.

22      Subsequently, on March 19, 2007, Wells Fargo and the trustee entered into a

23  stipulation that allowed the trustee, as the legal representative of the debtor, to exercise the

24  unexercised stock options Segovia held under the LTICP, and the bankruptcy court

25  approved the stipulation on March 23, 2007.  In response, on April 13, 2007, Segovia filed

26  amended bankruptcy schedules in which she claimed that the stock options were exempt

27  and not property of the bankruptcy estate because they constituted a qualified retirement

28

**United States District Court**
For the Northern District of California

1    account.

2        On May 9, 2007, the trustee objected to Segovia's characterization of the stock

3    options in her amended schedules, asserting that the LTICP under which the options arose

4    was not an ERISA-protected or qualified plan, nor was it a retirement plan exempt under

5    California law.  A week later, on May 16, 2007, the trustee and Wells Fargo entered into an

6    amended stipulation to facilitate the trustee's ability to exercise the stock options, which

7    was approved by the bankruptcy court on May 29, 2007.  In that stipulation, Wells Fargo

8    and the trustee agreed that the LTCIP, under which Segovia received the stock options,

9    was not subject to ERISA, and did not constitute an Employee Stock Ownership Plan,

10   commonly referred to as an "ESOP."  They noted that their prior March 19, 2007 stipulation

11   "appear[ed] to have incorrectly characterized the LTICP as a qualified employee stock

12   ownership plan and mischaracterized the Debtor's stock options as qualified stock options."

13   Appellee's Excerpts of Record ("E.R.") Exh. 8.

14       On June 5, 2007, Segovia filed a declaration in support of her claim that the stock

15   options were exempt.  On June 21, 2007, the trustee exercised the stock options pursuant

16   to the May 29, 2007 stipulation and order, and realized net proceeds of $399,498.42, which

17   the trustee held in a trust account in connection with Segovia's bankruptcy case.  From

18   June 2007 until June 2008, the parties prepared for trial before the bankruptcy court

19   regarding Segovia's claimed exemption.  During this time, on September 29, 2007, Segovia

20   again amended her bankruptcy schedules and specifically claimed that the LTICP, under

21   which the stock options arose, was an ERISA-defined "pension benefit plan" or "employee

22   benefit plan," and was thus wholly excluded from the chapter 7 bankruptcy estate.  Segovia

23   additionally claimed that the options constituted "retirement benefits," that were exempt

24   under state law.

25       On June 5, 2008, the bankruptcy court held a hearing on Segovia's claimed

26   exemption.  Prior to the hearing, the parties submitted stipulated facts, in addition to

27   twenty-six trial exhibits, including Segovia's bankruptcy schedules, transcripts of her

28

1    deposition, transcripts of depositions of other Wells Fargo executives, the LTICP, tax forms,

2    and other correspondence from Wells Fargo.  There was no testimony at the hearing, nor

3    was any new evidence introduced.  The bankruptcy court decided the matter based on the

4    evidence submitted, and on the parties' arguments at the hearing.

5          As mentioned, that evidence included deposition transcripts from two Wells Fargo

6    executives, Paula Roe, the executive vice president of compensation and benefits, and

7    Mary Morrow, the human resources manager.  Appellee's E.R. Exh. 10.  Roe testified that

8    she has managed the team that is responsible for executive compensation and all of Wells

9    Fargo's benefit  programs for approximately twenty years.  Roe herself makes day-to-day

10   administrative decisions regarding the LTICP.  *Id.* at 50.  In determining which employees

11   receive an award under the plan, recommendations are made to a committee, which

12   approves or rejects them.  *Id.* at 51.

13         In particular, Roe testified regarding the nature of Wells Fargo's LTICP, and also

14   regarding the purpose of particular provisions of the plan.  Roe explained that the options

15   are viewed as part of an individual's competitive compensation package.  *Id.* at 9.  She

16   testified that the intended benefit of the LTICP was to deliver compensation to employees,

17   and to allow them to share in the success of Wells Fargo through its stock appreciation.  *Id.*

18   at 30.  The awards have some element of deferred compensation because an employee

19   has to earn a right to them; however, the LTICP is not a deferred compensation plan.  *Id.* at

20   30, 32.  Roe noted that Wells Fargo has a separate deferred compensation plan.  *Id.* at 31.

21         Roe further testified that Wells Fargo did not view the stock options as a retirement

22   benefit or subject to ERISA.  *Id.* at 18.  Nor, according to Wells Fargo, are they an ESOP,

23   an employee stock ownership plan, because Wells Fargo actually has a different, separate

24   ESOP, in which Segovia also participated.  *Id.* at 19.  Roe testified that those ESOP rights

25   had nothing to do with the stock options under the LTICP.  *Id.*

26         Roe further explained that non-qualified stock options, like those Segovia received

27   under the plan, are the right to purchase a share of stock at a predetermined price over a

28

4

United States District Court

For the Northern District of California

defined period of time. *Id.* at 10.  She noted that the vesting term for options varies

according to the grant. *Id.* at 8.   Roe testified that once Segovia's stock options vested,

there was no limit on her ability to exercise the options as long as she continued "to be

employed or satisfied employment, eligibility and disability or retirement and employment."

*Id.* at 17.  Additionally, she clarified that there was no requirement that Segovia needed to

be retired in order to exercise the stock options. *Id.* at 17-18.   Once the shares are

exercised, then either the shares or the cash, depending on the type of exercise, are

deposited into the participant's brokerage account, which is set up by the participant. *Id.* at

39.

If an employee ceases to be employed by Wells Fargo - other than as a result of

death, retirement, or disability - the employee has three months from termination to

exercise her stock options, or if the options expire before the three months, then up until

the expiration date. *Id.* at 19-20. When an employee actually retires, their stock options

don't suddenly become somehow connected with ERISA or a retirement benefit. *Id.* at 55.

In fact, an employee's retirement doesn't do anything under the LTICP with respect to the

stock options other than extend the time for their exercise that the employee wouldn't have

had had they simply left Wells Fargo for other reasons. *Id.* at 56.  When an employee

retires, they continue to hold the rights in the stock options until the options expire or until

they exercise the options. *Id.* at 21.

In terms of retirement, an employee is the one who tells Wells Fargo that they're

retiring, not the other way around. *Id.* at 47.  And once the employee gives Wells Fargo a

date, then the people responsible for managing the health plan administer those plans.

Those people who manage the LTICP report up to Roe in the compensation department.

*Id.* at 47.

Roe testified that the non-transferability provision was added to the LTICP not to turn

it into a retirement plan, but instead to limit Wells Fargo's administration so that it was

working with the stock option recipient, and "not various assorted people." *Id.* at 16.

United States District Court

For the Northern District of California

1    As for Segovia, Roe testified that she was considered an "executive" in terms of the

2    options she received, *id.* at 9, which is synonymous with "highly compensated individual."

3    *Id.* at 40. Segovia received a total of six stock option grants.  *Id.* at 23-24.  Roe further

4    testified that Wells Fargo documents show that Segovia retired on March 3, 2007, and that

5    it is not possible for an employee at Wells Fargo to be on salary continuation leave and be

6    retired at the same time.  *Id.* at 28.  That is because during the time that one is receiving

7    salary continuation pay, that person continues to be an employee of Wells Fargo.  *Id.* at 27.

8    Morrow, in turn, also testified that Wells Fargo's records showed that Segovia retired

9    on March 3, 2007.  Trial Exh. 23.  She testified that at the time Segovia retired, she had

10   approximately $100,000 in a pension plan, and $635,000 in a 401(k) plan.[2]

11   Morrow testified regarding retirement eligibility under the LTICP, and specifically

12   regarding the "80 point" requirement.  Section 2.1(y) of the LTICP defines "retirement"

13   under the Plan as follows:

14   . . . .  For all awards granted subsequent to November 2, 1998, "Retirement"
     means termination of employment after reaching the earlier of (i) age 55 with

15   10 completed years of service, or (ii) *80 points (with one point credited for
     each completed age year and one point credited for each completed year of*

16   *service),* or (iii) age 65.  For purposes of this definition, a Participant is
     credited with one year of service after completion of each full 12-month period

17   of employment with the Company or an Affiliate as determined by the
     Company or Affiliate.

18   *Id.* at 18 (emphasis added).

19   Morrow's team is the one responsible for calculating whether an employee has 80

20   points and is entitled to retire.  Morrow testified that the 80 point retirement test generally

21   only comes into play if an employee is retiring at an age younger than 55.  *Id.*  The 80 point

22   calculation refers to age at the time of retirement, and also completed years at the time of

23   retirement.  Morrow testified that Segovia was 50 at the time she retired, and that she

24   would have had 84 points at that time.

25   Morrow, like Roe, also testified that when an employee, like Segovia, is placed on

26

27   ─────────────────

28   [2]This $735,000 was exempt from the bankruptcy estate.

6

salary continuation leave, they continue to be an employee of Wells Fargo.  On the other hand, if the employee chose to take a lump sum severance payment, then they would no longer be an employee and could be considered retired if they were retirement eligible. Roe reiterated that Segovia chose the salary continuation leave as opposed to a lump sum severance payment.

**B.     Segovia's Long-Term Incentive Compensation Plan ("LTICP")**

The pertinent provisions of the LTICP are as follows.

Section one, entitled "Purpose" provides in pertinent part:

> The purpose of Wells Fargo & Company' Long-Term Incentive Compensation Plan (the "Plan") is to motivate key employees to produce a superior return to the stockholders of Wells Fargo & Company by offering them an opportunity to participate in stockholder gains, by facilitating stock ownership and by rewarding them for achieving a high level of corporate financial performance. The Plan is also intended to facilitate recruiting and retaining talented executives for key positions by providing an attractive capital accumulation opportunity.

Appellee's E.R. Exh. 1.

The Plan's Prospectus reiterates the above purpose, and further provides under "General Information," that "[t]he Plan is not qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended (the "Code"), and is not subject to [ERISA]." Appellee's E.R. Exh. 2.

Section five sets forth limits on "participation" in the Plan, and provides in pertinent part:

> Participation in the Plan shall be limited to Employees of the Company or an Affiliate selected by the Committee.  Options intending to qualify as Incentive Stock Options may only be granted to employees of the Company or any subsidiary within the meaning of the Code.  Participation is entirely at the discretion of the Committee, and is not automatically continued after an initial period of participation.

Section ten concerns options granted under the plan and provides in pertinent part as follows:

> Options.  The Committee may grant an Option or provide for the grant of an Option, either from time-to-time in the discretion of the Committee or automatically upon the occurrence of specified events, including, without limitation, the achievement of performance goals (which may include

7

Qualifying Performance Criteria).  Except to the extent provided herein, no Participant (or Beneficiary of a deceased Participant) shall have any rights as a stockholder with respect to any Shares subject to an Option granted hereunder until said Shares have been issued.  Options granted pursuant to the Plan need not be identical, but each Option must contain and be subject to the terms and conditions set forth below.

        10.1   <u>Type of Option; Number of Shares.</u>  Each Option shall be evidenced by an Award Agreement identifying the Option represented thereby as an Incentive Stock Option or Non-Qualified Stock Option, as the case may be, and the number of Shares to which the Option applies.

    . . . .

        10.3   <u>Exercisability.</u>  The Committee shall have the right to make the timing of the ability to exercise any Option subject to continued employment, the passage of time and/or such performance requirements as deemed appropriate by the Committee, provided that in no event shall any Option awarded to a Participant provide for full vesting in a period of less than one year, other than as a result of or upon the death, disability or Retirement of the Participant or a change in control of the Company.

. . . .

        10.8   <u>Termination of Employment.</u>

        (a) <u>Due to Death, Disability, or Retirement.</u>  If a Participant ceases to be an Employee by reason of his death, permanent disability or Retirement, each outstanding Option shall become exercisable to the extent and for such period or periods determined by the Committee but not beyond the expiration date of said Option.  If a Participant dies before exercising all outstanding Options, the outstanding Options shall be exercisable by the Participant's Beneficiary.

        (b) <u>Other than Death, Disability, or Retirement.</u>  Unless the Committee provides otherwise, in the event a Participant ceases to be an Employee for any reason other than his death, permanent disability or Retirement, all rights of the Participant under this Plan shall immediately terminate without notice of any kind.

The Plan Prospectus further speaks to the exercise of stock options, and provides in pertinent part:

Stock options may be exercised during a period of time fixed by the Committee except that no stock option may be exercised more than ten years after the date of grant. . . .  Once exercisable, a person entitled to exercise an option may, subject to its terms and the terms of the Plan, exercise it in whole at any time, or in part from time to time, by delivery of notice of exercise in the manner provided in the award communication, specifying the number of shares with respect to which the option is being exercised, accompanied by payment of the purchase price of the shares to be purchased.  Payment for shares of stock acquired on exercise of a stock option may be made in cash,

United States District Court

For the Northern District of California

1
2

in shares of Common Stock having a fair market value as of the date of exercise equal to the purchase price, or a combination thereof, as the Committee determine.

3
4
5

Stock options are exercisable only by the participant or his or her guardian or legal representative and only while the participant is an employee of the Company or an affiliate, except in the case of death, permanent disability, or Retirement . . . or as provided in Section 15 of the Plan, or as otherwise determined by the Committee.

6
7

A non-qualified stock option granted under the Plan may include the right to acquire a reload stock option ("Reload Option"), formerly known as an "Accelerated Ownership Non-Qualified Stock Option ("AO"). . . .

8

Appellee's E.R. Exh. 2, at 2-3.

9

Section twelve of the Plan, which was amended in 2005, specifies that

10

the rights under the Plan are generally nontransferable.  It provides in pertinent part:

11
12
13
14

12. Nontransferability of Rights.  Unless the Committee provides otherwise, (i) no rights under any Award will be assignable or transferable and no Participant or Beneficiary will have any power to anticipate, alienate, dispose of, pledge or encumber any rights under any Award, and (ii) the rights and the benefits of any Award may be exercised and received during the lifetime of the Participant only by the Participant or by the Participant's legal representative. . . .

15

Section sixteen of the Plan clarifies that the options and other awards under the Plan

16

may be conditioned on an employee's performance.

17

The Prospectus summarizes the federal income tax consequences to participants

18

who receive awards under the plan, based on the IRC.  It provides as follows regarding

19

non-qualified stock options:

20
21
22
23
24
25
26
27

A participant who receives a non-qualified stock option grant will not recognize income and the Company will not be allowed a deduction at the time such an option is granted.  When a participant exercises a non-qualified stock option, the difference between the option price and any higher fair market value of the stock on the date of exercise will be ordinary income to the participant and will be allowed as a deduction for federal income tax purposes to the Company or its subsidiary.  The capital gain holding period of the shares acquired will begin one day after the date such stock option is exercised.  When a participant disposes of shares acquired by the exercise of the option, any amount received in excess of the fair market value of the shares on the date of the exercise will be treated as short-term or long-term capital gain, depending on the holding period of the shares.  If the amount received is less than the fair market value of the shares on the date of exercise, the loss will be treated as short-term or long-term capital loss, depending on the holding period of the shares.

28

9

1  Appellee's E.R. Exh. 2, at 7.

2  **C.      Bankruptcy Court's Decision**

3        Following the June 5, 2008 hearing, on June 9, 2008, the bankruptcy court issued a

4  written order, ruling in the trustee's favor, and holding that Segovia's interests in her LTICP

5  were not exempt or excludable from the bankruptcy estate.  Appellee's E.R. Exh. 12. In a

6  fairly summary order, the court concluded that the LTICP did not constitute a private

7  retirement plan under California law, did not constitute a retirement plan under ERISA, and

8  also did not constitute a valid spendthrift trust.

9        In support, the bankruptcy court found that the purpose of the LTICP "is to

10  encourage key employees to work for the long-term health of the company by providing

11  pre-retirement income linked to the future value of the company stock."  It noted that "[t]he

12  stated purpose of the LTCIP was to motivate key employees to share in the future success

13  of Wells Fargo."  *Id.*  The court further found that

14        To induce the employee to make continued efforts on behalf of the company,
       the options generally do not vest immediately, the options may not be sold,
15        and the employee must remain employed by Wells Fargo.  If an employee is
       fired for cause, all unexercised options are revoked.  If the employee quits, all
16        vested options are lost if not exercised within three months, and unvested
       options are lost.  If employment ceases upon death, retirement, or disability,
17        however, all unvested options immediately become vested and be exercised
       at any time within their stated term.  The LTICP provides that options may not
18        be transferred and must be exercised by the employee or his or her personal
       representative.

19  *Id.*

20        Segovia subsequently appealed and elected to have the appeal heard by this court

21  rather than the Ninth Circuit Bankruptcy Appellate Panel ("BAP").

22                                    **ISSUES**

23        Segovia's papers were hardly a model of clarity in terms of setting forth the issues.

24  In her statement of issues ("SOI") filed June 30, 2008, Segovia asserted that she was

25  raising seventeen issues on appeal, including:

26        1.      Whether the bankruptcy court erred in sustaining the trustee's
              objection to her claimed exclusion/exemption claim in the Wells Fargo
27              LTICP stock options without fully addressing all of her ERISA-based

28

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

claims?

2.  Whether the bankruptcy court erred in finding the LTICP is not a private retirement plan because it was not designed or used as a retirement plan?

3.  Whether the bankruptcy court erred in finding that Segovia did not use the LTICP as a retirement plan, or whether this was even relevant to the legal issues at hand?

4.  Similar to 3., above, whether the bankruptcy court erred in assuming that expending option proceeds on Segovia's home was not for a retirement purpose?

5.  Whether the bankruptcy court erred in finding the LTICP is not a retirement plan under ERISA?

6.  Whether the bankruptcy court erred in finding that the LTICP does not provide retirement benefits or defer income within the meaning of 29 U.S.C. § 1002(2)(A)?

7.  Whether the bankruptcy court erred in finding that the LTICP is not a trust?

8.  Whether the LTICP granted Segovia contractual rights in the stock options which once vested as retirement benefits imposed trust obligations upon the LTICP administrators enforceable by ERISA?

9.  Whether the bankruptcy court erred by failing to apply the standards used by the federal district courts in determining whether an employer arrangement is "subject to" ERISA?

10. Whether the bankruptcy court erred by failing to recognize and apply the criteria used by federal district courts to interpret the provisions of an ERISA plan?

11. Whether the bankruptcy court erred by failing to address Segovia's argument that the original and amended stipulations between Wells Fargo and the trustee amount to an admission that the LTICP's "nontransferability of rights" provision is enforceable for both taxation and ERISA purposes?

12. Whether the bankruptcy court erred by effectively ruling that the LTICP stock options are not "double-insulated" by California's broader "private retirement plan" exemption scheme, and therefore are not preempted and excluded from the bankruptcy estate by ERISA?

13. Whether the debtor qualifies for equitable relief under ERISA § 502(a)(3), assuming the bankruptcy court erred in its determination that the LTICP is not subject to ERISA?

14. Whether the bankruptcy court erred by essentially using a pre-*Patterson v. Schumate* analysis of the LTICP?

11

United States District Court

For the Northern District of California

15.     Whether the bankruptcy court or the trustee has met their burden of proof that the LTICP is not subject to ERISA?

16.     Whether this case has broader public policy implications given the large number nationally of Wells Fargo employees and future retirees, as well as the interest of the general public and retirees as a whole, in seeing to it that ERISA is properly applied and enforced?

17.     Whether the rendering of an appellate opinion in this bankruptcy court appeal will make a significant contribution to ERISA's remedial policy goal of seeing the federal district courts forge a body of consistent "federal common law" regarding the sensible application and even-handed enforcement of ERISA?

However, in her opening brief filed September 3, 2008, Segovia stated that she was raising *six* issues, including:

1.     Whether the LTICP's non-qualified stock options are exempt as private retirement plan benefits under California Code of Civil Procedure § 704.115?

2.     Whether the LTICP's non-qualified stock options provide retirement income to employees or otherwise operate to defer the income of employees for periods extending to the termination of covered employment or beyond?

3.     Whether the LTICP's non-qualified stock options are subject to ERISA as a defined "pension plan"?

4      Whether the LTICP's "non-transferability of rights" or anti-alienation provision is not only enforceable for federal income tax qualification purposes, but also enforceable for ERISA purposes to exclude the stock options from Segovia's bankruptcy estate pursuant to § 541(c)(2)?

5.     Whether ERISA preempts California's Code of Civil Procedure § 704.115 to the extent the California statute speaks to pensions regulated exclusively by ERISA?; and

6.     Whether Segovia qualifies for equitable relief under ERISA § 502(a)(3), assuming that the bankruptcy court erred in its determination that the LTICP's non-qualified stock options are not subject to ERISA?

The court finds that Segovia's lack of clarity and organization extends beyond her inability to coherently and consistently set forth the issues.  It was a enormous challenge for the court not only to ascertain the true issues on appeal, but also to ascertain what Segovia's arguments were regarding many of the issues she raised.  This was in part due to Segovia's failure to provide the court with a cohesive and comprehensive statement

United States District Court

For the Northern District of California

1  regarding the background facts and the bankruptcy court's ruling, in addition to the

2  controlling legal standards regarding the issues raised.  It was also due in large part to the

3  fact that Segovia didn't bother to address many of the issues that she raised in her

4  statement of issues in her opening brief.

5       Nevertheless, after extensive efforts, the court finds that the issues raised by

6  Segovia generally fall into four categories: (1) whether the LTICP's non-qualified stock

7  options are exempt as private retirement plan benefits under California Code of Civil

8  Procedure § 704.115; (2) whether the LTICP is a pension plan subject to ERISA and

9  excludable from the bankruptcy estate: (3) whether the LTICP qualifies as a spendthrift

10  trust under 541(c)(2); and (4) other related issues.  The court has addressed the above

11  issues in its discussion of each of the four categories.

12       Specifically, the court finds that SOI issues 1,2, and 3, and issue 1 in Segovia's

13  opening brief pertain to the private retirement plan issue.  SOI issues 5, 6, 9, 19, 11, 13, 14,

14  15, 16, and 17, and issues 2, 3, and 4, and 6 in Segovia's opening brief pertain to the

15  ERISA-related issue.  SOI issues 7 and 8 pertain to the trust issue.  SOI issue 12 and

16  Segovia's opening brief issue 5 pertain to other related issues.  Because the standards of

17  review differ depending on the issue, the court has addressed those below in its discussion

18  of each of the four categories.

19                                    **DISCUSSION**

20  **I.    Whether the LTICP's Stock Options are Exempt as Private Retirement Plan**
         **Benefits under California Code of Civil Procedure § 704.115**

21
         A debtor in bankruptcy is entitled to exempt certain assets from the bankruptcy

22
   estate. 11 U.S.C. §§ 522, 541; *see also Jacoway v. Wolfe (In re Jacoway)*, 255 B.R. 234,

23
   237 (9th Cir. BAP 2000).   Under Bankruptcy Code § 522(b), states can prohibit their

24
   citizens from choosing the exemptions set out in section 522(d), or in other words, "opt out"

25
   of the federal exemptions, and instead limit their citizens to the exemptions available under

26
   applicable state and federal nonbankruptcy law.  4 Collier on Bankruptcy § 522.01 (15th ed.

27
   rev'd 2007).  California is one of thirty-four states that has opted out of the federal

28

**United States District Court**
For the Northern District of California

1    exemption system. *Id.; see also In re Simpson*, --- F.3d. ---- , 2009 WL 426405 at *2 (9th

2    Cir. 2009); *Jacoway*, 255 B.R. at 237 (citing Cal. Code Civ. Proc. § 703.130).

3        Here, Segovia claims that the unexercised stock options under the LTICP are

4    exempt because the LTICP constitutes a "private retirement plan" under California Code of

5    Civil Procedure section 704.115.

6        Section 704.115 provides:

7        (a) As used in this section, "private retirement plan" means:

8            (1) Private retirement plans, including, but not limited to, union
             retirement plans.

9

10           (2) Profit-sharing plans designed and used for retirement purposes.

11           (3) Self-employed retirement plans and individual retirement annuities
             or accounts provided for in the Internal Revenue Code of 1986, as
             amended, including individual retirement accounts qualified under

12           Section 408 or 408A of that code, to the extent the amounts held in the
             plans, annuities, or accounts do not exceed the maximum amounts

13           exempt from federal income taxation under that code.

14       (b) All amounts held, controlled, or in process of distribution by a private
         retirement plan, for the payment of benefits as an annuity, pension, retirement

15       allowance, disability payment, or death benefit from a private retirement plan
         are exempt.

16

17       The California Legislature has not defined a "private retirement plan" as the term is

18   used in section 704.115 in any meaningful way. *In re Phillips*, 206 B.R. 196, 202 (Bankr.

19   N.D. Cal. 1997). "The purpose of the section 704.115 exemption for the corpus of private

20   retirement plans is to safeguard a stream of income for retirees at the expense of

     bankruptcy creditors." *In re MacIntyre*, 74 F.3d 186, 188 (9th Cir. 1996).

21

22       However, even if a plan constitutes a "private retirement plan" under section

23   704.115, the next question is whether it was "designed and used" for the debtor's

24   retirement purposes. *Bloom v. Robinson (In re Bloom)*, 839 F.2d 1376 (9th Cir. 1988)

25   (noting that "[i]t is true that § 704.115 does not explicitly require private retirement plans to

26   be 'designed and used for retirement purposes' in order to be exempt [b]ut . . . that the

27   absent phrase is implicit in the term 'retirement plans'"). If both questions are answered in

28   the affirmative, then all assets in the plan are exempt. *In re Phillips*, 206 B.R. at 200.

**United States District Court**

For the Northern District of California

1    The Ninth Circuit has held that the purpose of this second inquiry is distinct and

2   limited.  *In re Simpson*, 2009 WL 426405 at *5.  "It does not allow the debtor to circumvent

3   the statutory definitions and categorize the asset as an exempt private retirement plan."  *Id.*

4    Rather, the inquiry seeks only to determine whether an asset that fits the definition of a

5   "private retirement plan" should nonetheless be excluded from exemption because the

6   debtor treats it as something other than a retirement asset.  *Id.*  Thus, while the debtor's

7   subjective intent cannot create an exemption, it may take one away.  *Id.* (citing *In re*

8   *Lieberman*, 245 F.3d 1090, 1095 (9th Cir. 2001) (a debtor's subjective intent for or use of

9   the asset is irrelevant to the analysis).

10    A retirement account need not be used *solely* for retirement purposes to be exempt

11   under § 704.115, but must be used *primarily* for retirement purposes.  *Jacoway*, 255 B.R.

12   at 239.  The plan may have two purposes, one to supplement current income and the other

13   to provide for retirement.  *Id.*  The Ninth Circuit has held that "[p]articularly in light of the

14   liberal construction given to exemption statutes, where a plan is designed and used for dual

15   purposes, the court should consider whether the principal purpose is to provide for

16   retirement or to provide for current needs."  *Id.* (citing *Spencer v. Lowery*, 235 Cal.App.3d

17   1636, 1639 (Cal. Ct. App. 1991)); *accord Dudley v. Anderson* (*In re Dudley*)*,* 249 F.3d

18   1170, 1176-77 (9th Cir. 2001).

19    Segovia argued summarily in her trial brief before the bankruptcy court that the

20   LTICP stock options were wholly exempted by section 704.115.  The trustee countered that

21   testimony from a Wells Fargo executive, along with the LTICP itself, demonstrated that the

22   stock options were an *incentive* provided to employees and not a retirement benefit. She

23   asserted that this was further demonstrated by the fact that Segovia exercised some of the

24   options pre-petition, realizing significant profits, and that the exercise of the options was not

25   restricted by the LTICP or any other source, nor were there any tax issues or penalties

26   related to their exercise.

27    Following the hearing, the bankruptcy court held that the LTICP was not exempt

28

United States District Court

For the Northern District of California

1  under section 704.115 as a private retirement plan because it was not designed or used as

2  a retirement plan.  The court found that "[t]he purpose of the plan is to encourage key

3  employees to work for the long-term health of the company by providing pre-retirement

4  income linked to the future value of the company stock."  It found that "[t]he fact that vesting

5  of the options may be accelerated upon retirement [was] merely incidental to the

6  [incentivizing] purpose."  The court also found that the Segovia did not use the LTICP as a

7  retirement plan, but instead "generally exercised the options promptly upon vesting and

8  expended the proceeds on improving her home."

9        In her opening brief on appeal, Segovia argues that the bankruptcy court erred

10  because LTICP section 2.1(y), defining retirement, evidences Wells Fargo's intent to design

11  a "retirement" plan.  She contends that:

12       the LTICP's applicable '80 pt.' retirement scheme criteria was the retirement 'finish
        line' that [she] would have to cross in order to have a vested retirement right to
13       exercise her unexpired ten-year stock options beyond her employment termination
        or "retirement date."  Had [she] not crossed that finish line her only contractual
14       obligation under the express terms of the LTICP would have been to exercise all of
        her unexercised stock options prior to her 'non-retirement' termination date.

15  Opening Br. at 6.  Segovia further notes that contrary to *Phillips*, a case cited by the

16  bankruptcy court in its order, the LTICP was designed and operated by her employer, and

17  not by herself.

18        Segovia also contends that there is no evidence that she attempted to elude

19  creditors with the exercise of her stock options, and suggests that she actually had no

20  control over them.  She acknowledges that she exercised approximately 31% of her total

21  stock options prior to retirement, but suggests that this does not negate the fact that they

22  were still used primarily for retirement purposes.

23        In opposition, the trustee argues that the bankruptcy court's findings were correct.

24  She notes that section one of the LTICP expressly states that its purpose is "to motivate

25  key employees to produce a superior return to the stockholders of Wells Fargo & Company

26  by offering them an opportunity to participate in stockholder gains, by facilitating stock

27  ownership and by rewarding them for achieving a high level of corporate financial

28

United States District Court

For the Northern District of California

1  performance."  Appellee's E.R., Ex. 1 at 1.  The trustee also relies on a district court

2  decision cited by the bankruptcy court below, *International Paper Co. v. Suwyn*, 978

3  F.Supp. 506, 509-12 (S.D.N.Y. 1997).  In *Suwyn*, the district court held that a key factor in

4  determining whether plans are primarily designed for retirement purposes includes whether

5  benefits are paid on a current basis before retirement age, or are otherwise available

6  periodically during the course of employment, or whether any payments that may, in fact,

7  be made after termination or retirement are merely incidental.  *Id.*  Here, the trustee points

8  out that Segovia's options vested prior to the termination of her employment.

9          The trustee also argues that Segovia did not in fact use the plan as a retirement

10  plan, noting that she generally exercised her options immediately upon vesting, while

11  actively employed and prior to retirement.  She argues that Segovia's exercise of 31% of

12  the options granted to fund home improvements was neither de minimus nor an isolated

13  occurrence.

14          On appeal, the issue of whether a plan is designed and used for retirement purposes

15  is a question of fact that this court reviews for clear error.  *In re Jacoway*, 255 B.R. at 237.

16  "A factual determination is clearly erroneous if the appellate court, after reviewing the

17  record, has a firm and definite conviction that a mistake has been committed."  *Wall St.*

18  *Plaza, LLC v. JSJF Corp. (In re JSJF Corp.)*, 344 B.R. 94, 99 (9th Cir. BAP 2006) (citing

19  *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)).

20          Here, the court need not decide the first prong - whether or not the LTICP

21  constitutes a "private retirement plan" under section 704.115 – because it concludes that

22  even if the plan did in fact satisfy the statutory language of that section, it is nevertheless

23  *not* exempt from the bankruptcy estate because the LTICP was not "designed and used"

24  for Segovia's retirement purposes.

25          First, the court agrees with the bankruptcy court, that based on the language of the

26  LTICP and the testimony of Roe and Morrow, the plan was not "designed" for retirement

27  purposes.  The LTICP could be no clearer that its purpose is to incentivize and to retain

28

17

United States District Court

For the Northern District of California

1    employees, and Roe confirmed that this was the case.  Additionally, the fact that Wells

2    Fargo already provided employees with pension and 401(k) plans expressly *designed* for

3    retirement purposes further demonstrates that the LTICP was not also designed for such a

4    purpose.

5          Second, concerning Segovia's "use" of the LTICP, the court finds that, in spite of the

6    fact that the LTICP was maintained by Segovia's employer, this case is nevertheless

7    similar to the Ninth Circuit's decision in *In re Daniel*.[3]  771 F.2d 1352, 1357-58 (9th Cir.

8    1985), *abrogated on other grounds by Patterson v. Shumate*, 504 U.S. 753 (1992).  In

9    *Daniel*, the debtor was a physician who was employed by his own professional corporation.

10   *Id.* at 1354.  The corporation formed a pension and profit-sharing plan, which the debtor

11   managed and controlled.  *Id.*  The debtor took an unsecured loan of $75,000 from the plan,

12   which represented most of the debtor's interest in the plan.  *Id.*  Although he agreed to

13   repay the loan at 10% interest, when the loan became due, the debtor rolled it over to

14   another promissory note and never made any payments.  *Id.*  Two weeks before the debtor

15   filed his bankruptcy petition, he caused his corporation to contribute $39,000 to the plan,

16   which was all of the corporation's available cash.  *Id.*

17         Considering the claim of exemption in the plan under California's predecessor to §

18   704.115, which contained provisions similar to those contained in the current statute, the

19   Ninth Circuit concluded that the debtor had not used the plan "principally" for retirement

20   purposes.  *Id.* at 1357-58.  The court noted that the debtor's unsecured $75,000 loan to

21   himself from the plan, which depleted nearly the entire value of the plan, was "more a

22   withdrawal than a loan, thereby negating a retirement 'use' purpose."  *Id.* at 1357.  The

23   court continued:  "If debtor's real concern had been retirement, rather than buying a

24   residence with pre-tax dollars, he would surely have invested the funds in assets which

25   would yield a competitive money market return, would provide adequate security, and

26

27         [3]Segovia is erroneous in her suggestion in her SOI that her "use" of the LTICP was not
     relevant.

28

United States District Court

For the Northern District of California

1   would preserve and enhance the capital of the plan." *Id.*  The court also determined that

2   "the transfer of $39,000 from the corporation to the plan on the eve of bankruptcy further

3   demonstrate[d] that the debtor's use of the plan was not for retirement purposes." *Id.*  The

4   *Daniel* court further stated:

5           [T]he plan essentially operated to meet debtor's short-term personal needs by
            lending money or shielding and hiding funds from creditors. Moreover, the

6           debtor has failed to show how his transactions with the plan, by virtue of his
            role as trustee, were in furtherance of legitimate long-term retirement

7           purposes.

8   *Id.* at 1358. The Ninth Circuit thus concluded that "the lower courts were amply justified in

9   finding that the debtor's plan was not principally 'used for retirement purposes [.]'" *Id.*

10          Similar to the plaintiff in *Daniels*, Segovia also exercised her vested stock options

11  pre-petition for a non-retirement purpose.  The court rejects Segovia's contention that the

12  remodeling of her home could somehow be characterized as having a "retirement purpose."

13  Here, as correctly noted by the bankruptcy court, Segovia developed a pattern of exercising

14  her stock options as they vested, as opposed to saving or investing them for retirement

15  purposes.

16          This case is unlike *Bloom,* in which the Ninth Circuit held that the debtor's retirement

17  plans were not so abused as to lose their retirement purpose.  839 F.2d at 1379.  In *Bloom*,

18  the debtor had taken loans from her private retirement and profit sharing plans, which had

19  been created by the medical corporation of which she was a 50% owner.  *Id.* at 1377.  At

20  the time she filed bankruptcy, the debtor's interest in the plans was approximately

21  $475,000.  *Id.*  This amount included $300,000 the debtor owed on promissory notes for

22  loans she had taken from the plan.  *Id.*  The debtor had made interest payments on the

23  loans, but had not repaid any principal.  *Id.*  The court concluded that "Bloom's plans were

24  not so abused as to lose their retirement purpose," based on four circumstances.  *Id.* at

25  1379.

26          First, it found that debtor followed the procedures set out in the plan for obtaining

27  loans.  *Id.*  Second, the debtor was charged a reasonable rate of interest on the loans.  *Id.*

28

19

United States District Court

For the Northern District of California

1    Third, she regularly made the interest payments due, over a period of several years. The

2    court found that these three factors indicated that, unlike the debtor in *Daniel*, the

3    transactions were not "more a withdrawal than a loan." *Id.* (citing *Daniel*, 771 F.2d at

4    1357).  Fourth, the court found that there was no indication that the debtor used the plan to

5    hide otherwise ineligible assets from bankruptcy administration, as did the debtor in Daniel.

6    In sum, the court held that the debtor did not cease to treat her plans as retirement plans.

7    *Id.*

8        Here, as Roe attested, unlike *Bloom*, the LTICP does not contain any limits on a

9    participant's exercise of stock options once they have vested.  Segovia did not have to take

10   a promissory note on the $205,591.63 worth of options that she exercised to remodel her

11   home.  Like *Daniel*, the options that Segovia exercised pre-petition were much more in the

12   nature of "a withdrawal than a loan."  771 F.2d at 1357.  Furthermore, Segovia's exercise of

13   her vested stock options, which represented more than one-third of the value of the options

14   she held under the LTICP, could hardly be considered "de minimus."  *See Jacoway*, 255

15   B.R. at 240.

16       For these reasons, the court AFFIRMS the bankruptcy court on this issue, and finds

17   that it did not commit clear error in determining that the LTICP was not designed for or used

18   by Segovia for retirement purposes.  Accordingly, all of the claims related to this issue fail.

19   **II.    Whether the LTICP is a Pension Plan Subject to ERISA and Excludable from**
         **the Bankruptcy Estate under Bankruptcy Code § 541(c)(2)**

20

21       Segovia also argued below that the LTICP stock options were *excludable* from the

22   bankruptcy estate under Bankruptcy Code § 541(c)(2) as pension plan benefits protected

23   by ERISA.[4]

24       Pursuant to 11 U.S.C. § 541(a)(1), the property of a bankruptcy estate includes "all

25   legal or equitable interests of the debtor in property as of the commencement of the case,"

26

27       [4] Another method - in addition to *exemptions* under section 522(d) - for placing property
     beyond the reach of creditors in a bankruptcy case is to *exclude* it from the bankruptcy estate
     entirely.  *See* 4 Collier on Bankruptcy § 522.10[7].  If the property is *excluded* from the estate,
28   then there is no need to *exempt* it as well.  *Id.*

**United States District Court**
For the Northern District of California

1  "[e]xcept as provided in subsections (b) and (c)(2)."  Subsection (c)(2) provides that a

2  "restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable

3  under applicable nonbankruptcy law is enforceable in a case under this title."  *Id.* §

4  541(c)(2).  In other words, subsection (c)(2) provides that trust anti-alienation provisions

5  otherwise enforceable under nonbankruptcy law will operate in a bankruptcy case to

6  prevent the transfer of the debtor's interest in the trust to the bankruptcy estate.  *United*

7  *States I.R.S. v. Snyder*, 343 F.3d 1171, 1178 (9th Cir. 2003).

8         In *Patterson v. Shumate*, the Supreme Court was asked to decide whether

9  "applicable nonbankruptcy law" included federal as well as state law.  504 U.S.at 759-60.

10  The Court held that federal law, including ERISA, constituted "applicable nonbankruptcy

11  law" under § 541(c)(2), and therefore that the anti-alienation clause required for ERISA

12  qualification constitutes a restriction on transfer enforceable under "applicable

13  nonbankruptcy law" within the meaning of § 541(c)(2).  *Id.*; *see also* 29 U.S.C. § 1056(d)(1)

14  ("Each pension plan shall provide that benefits provided under the plan may not be

15  assigned or alienated.").  Accordingly, the Court held that a debtor's interest in an

16  ERISA-qualified plan is excluded from the property of the bankruptcy estate.  504 U.S. at

17  765.  It reasoned that the transfer restriction required in every ERISA plan was enforceable

18  because ERISA-plan participants or beneficiaries could enforce that transfer restriction

19  through ERISA's civil remedies.  *Lowenschuss v. Selnick (In re Lowenschuss)*, 171 F.3d

20  673, 682 (9th Cir. 1999) (citing *Patterson,* 504 U.S. at 760).

21         **A.     Whether the LTICP is an ERISA plan**

22         It was undisputed that the plan at issue in *Patterson* was ERISA-qualified.

23  Therefore, the *Patterson* Court did not need to reach the issue regarding what constitutes

24  an ERISA-qualified plan.  *See Watson v. Proctor (In re Watson)*, 214 B.R. 597, 601 (9th

25  Cir. BAP 1997).  However, unlike *Patterson*, the parties here dispute whether the LTICP

26  constitutes an ERISA plan.   Therefore, before this court considers whether the stock

27  options are excludable under Bankruptcy Code § 541(c)(2), it must first determine whether

28

United States District Court

For the Northern District of California

1    the LTICP constitutes a pension plan covered by ERISA.

2    **1.**    **Legal Standards**

3    **a.**    **ERISA Generally**

4    Title I of ERISA applies to "any employee benefit plan." 29 U.S.C. § 1003(a). An

5    employee benefit plan is defined as "an employee welfare benefit plan or an employee

6    pension benefit plan or a plan which is both an employee welfare benefit plan and an

7    employee pension benefit plan." 29 U.S.C. § 1002(3). Segovia claims the LTICP is an

8    employee pension benefit plan, as defined by 29 U.S.C. § 1002(2)(A).

9    An "employee pension benefit plan" is defined in the statute as:

10    [A]ny plan, fund or program which was heretofore or is hereafter established
or maintained by an employer, or by an employee organization or by both, to
11    the extent that by its express terms or as a result of surrounding
circumstances such plan, fund or program--
12

(i) provides retirement income to employees, or
13

(ii) results in a deferral of income by employees for periods extending to the
14    termination of covered employment or beyond, regardless of the method of
calculating the contributions made to the plan, the method of calculating the
15    benefits under the plan or the method of distributing benefits from the plan.

16    ERISA § 3(2)(A), 29 U.S.C.A. § 1002(2)(A).

17    A plan constitutes an "employee pension benefit plan" or "pension plan" under

18    ERISA to the extent that, by its express terms, or as a result of "surrounding

19    circumstances," the "plan, fund, or program" provides retirement income to employees, or

20    results in a deferral of income by employees for periods extending to the termination of

21    covered employment or beyond. *ERISA and Other Nontax Rules Common to Qualified and*

22    *Nonqualified Plans*, Pension Analysis P 48,102 (RIA 2009) (citing ERISA § 3(2)(A)).

23    As for express plans, the Ninth Circuit has held that an ERISA plan must be

24    maintained pursuant to a written instrument. *Cinnelli v. Security Pacific Corp.*, 61 F.3d

25    1437, 1441 (9th Cir. 1995) (citing *Watkins v. Westinghouse Hanford Co.*, 12 F.3d 1517,

26    1523 n. 1 (9th Cir. 1993) (holding that letters from employee's company did not create an

27    ERISA plan because they "contain[ed] none of the details about beneficiaries, source of

28

22

United States District Court

For the Northern District of California

1   financing, or procedures for paying and administering benefits that are necessary to create

2   an ERISA plan" )); 29 U.S.C. § 1102(a)(1).  Plan documents must be strictly construed.  *Id.*

3   "Each such plan must (1) provide a policy and a method for funding the plan, (2) describe a

4   procedure for plan operation and administration, (3) provide a procedure for amending the

5   plan, and (4) specify a basis for payments to and from the plan."  *Id.* (quoting *Watkins*, 12

6   F.3d at 1523 n. 1); 29 U.S.C. § 1102(b). "It is the reality of the plan, fund or program and

7   not the decision to extend certain benefits that is determinative."  *Id.*  The intent to create a

8   plan is not enough.  *Id.*

9           A pension benefit plan may nevertheless be created even without a formal

10  intentional plan adoption if "from the surrounding circumstances a reasonable person can

11  ascertain the intended benefits, a class of beneficiaries, the source of financing, and

12  procedures for receiving benefits."  *Carver v. Westinghouse Hanford Co.*, 951 F.2d 1083,

13  1086 (9th Cir. 1991) (quoting *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir.

14  1982)).

> A decision to extend benefits is not the establishment of a plan or program.
> Acts or events that record, exemplify or implement the decision will be direct
> or circumstantial evidence that the decision has become reality ... assuring
> employees that a plan or program exists [for example]-but it is the reality of a
> plan, fund or program and not the decision to extend certain benefits that is
> determinative.

*Id.* (citing *Donovan*, 688 F.2d at 1373).  The Department of Labor ("DOL") has further

specified that a plan that is not *expressly* an employee pension benefit plan, may be

regarded as a pension plan, as a result of the following surrounding circumstances, which

are similar but not identical to those set forth in *Donovan*:

> (1)   if it were administered in a way that had the effect of providing retirement
>        income to employees,
>
> (2)   if it resulted in a deferral of income by employees extending to termination of
>        covered employment or beyond, or
>
> (3)   if communications to plan participants suggested that the plan was
>        established or maintained for either or both of these purposes.

23

United States District Court

For the Northern District of California

1  ERISA Opinion Letter 90-17A (1990).[5]  Satisfying the "surrounding circumstances" inquiry,

2  also known as the "*Donovan* test or inquiry," however, does not necessarily result in a

3  presumption that a plan is an ERISA plan.  *Golden Gate Restaurant Assoc*, 546 F.3d 639,

4  652 (9th Cir. 2008) (citing *Winterrowd v. American General Annuity Ins. Co.*, 321 F.3d 933

5  (9th Cir. 2003)).

6        The Ninth Circuit has further held that the "surrounding circumstances" inquiry, or

7  *Donovan* test, is limited to instances where a formal plan is absent, and where the question

8  remains whether a de facto ERISA plan exists.  *Cinnelli*, 61 F.2d at 1443; *see also Scott v.*

9  *Gulf Oil Corp.*, 754 F.2d 1499 (9th Cir. 1985) (concluding, applying the *Donovan* analysis,

10 that allegations in the complaint that an employer orally agreed to provide benefits could

11 create a plan); *Modzelewski v. Resolution Trust Corp.*, 14 F.3d 1374, 1376-77 (9th Cir.

12 1994) (concluding an employment contract sufficiently contained the required elements set

13 out in *Scott*); *Watkins*, 15 F.3d at 1522 (applying *Donovan* and concluding that letters did

14 not contain the necessary information required to create an ERISA plan in accordance with

15 the statute).

16                          **b.    Stock Option Plans**

17        A stock option serves as a form of compensation and consists primarily of a grant to

18 an employee, by an employer or its affiliate, of an option to purchase stock of the employer.

19 *See* Mancoff and Weiner, Nonqual. Deferred Comp. Arrang. § 3:02, *Comparison of*

20 *Incentive Stock Options and Nonstatutory Stock Options* (Sept. 2008). The option is

21 generally granted in return for services that have been or will be rendered to the employer.

22 *Id.*  A stock option plan generally does not satisfy the pension plan definition and is

23 therefore not subject to ERISA because it is typically not designed to provide retirement

24 _____

25        [5]ERISA opinion letters are issued by the Department of Labor ("DOL"), which provides
    advisory opinions on ERISA coverage questions.  *Williams v. Wright*, 927 F.2d 1540, 1545
26 (11th Cir. 1991).  ERISA opinion letters are not binding on the court.  *Patelco Credit Union v.*
    *Sahni*, 262 F.3d 897, 908 (9th Cir. 2001).  However, because the DOL is an agency that
27 administers portions of ERISA, its opinions are entitled to substantial weight. *See Bance v.*
    *Alaska Carpenters Retirement Plan*, 829 F.2d 820, 827 (9th Cir. 1987); *Williams*, 927 F.2d at
28 1545 (though not binding, ERISA opinion letters "carry considerable weight").

United States District Court

For the Northern District of California

income, even if an optionee exercises an option after retirement. *See generally Oatway v. American Internat'l Grp.,* 325 F.3d 184, 188 (3d Cir. 2003); *see also* Ronald J. Cooke, 1 ERISA Practice & Procedure § 2:4, *Employee Pension Benefit Plans* (rev'd Oct. 2008).

The mere possibility that payments under a stock option plan could be made after retirement or termination does not in itself cause a plan to be considered a retirement plan. *See* ERISA Opinion Letter 2002-13A (Dec. 6, 2002). A plan, however, may be considered a pension plan if distributions are skewed toward the last years of participants' careers, ERISA Opinion Letter 81-27(A) (March 9, 1981), or if payments are not made often enough or within a reasonable time to avoid serving as retirement income. ERISA Opinion Letter 98-02A. The DOL has indicated that a plan may be considered a pension plan if communications regarding the plan suggest that it is being maintained for the purpose of providing retirement income or deferring payments until or beyond termination. ERISA Opinion Letter 80-65A; ERISA Opinion Letter 90-17A. Similarly, plan communications which cause participants to act in a way that they defer payments until retirement may prompt the DOL to conclude that a plan is subject to ERISA. ERISA Opinion Letter 98-02A.

Additionally, to the extent that a stock option plan constitutes a bonus, it is similarly not subject to ERISA. Bonus programs are not pension plans where payments are made as bonuses for work performed unless such bonuses are systematically deferred to the termination of covered employment or beyond in such a fashion as to provide retirement income. 1 ERISA Practice & Procedure at § 2:4; *see also* Pension Analysis at P 48,102 (RIA 2009); P 48,107 (RIA 2009).[6] In ERISA Opinion Letter 89-07A (April 27, 1989), the DOL ruled that an incentive bonus plan was not a pension plan within ERISA's definition because the bonus payments did not constitute retirement income. The Department

---

[6]The exclusion for bonus payments applies unless such payments are "systematically deferred to the termination of covered employment or beyond." 29 C.F.R. § 2510.3.2(C). Specifically, the regulation excludes from the definition: "[P]ayments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income for employees." 29 C.F.R. § 2510.3-2(c).

United States District Court
For the Northern District of California

1   continued by stating that a bonus program could be a pension plan where payments under

2   it were systematically deferred until such time as the participant terminates employment or

3   if the payments provided retirement income.  *Id.*  The Department concluded that the plan

4   under consideration did not contemplate the deferral of income to the termination of

5   covered work or beyond.  *Id.*

6          The DOL has refused to rule specifically regarding what type of "surrounding

7   circumstances" would cause a bonus, deferred compensation, and/or other stock option

8   plan to become a pension plan subject to ERISA, stating that the question is "inherently

9   factual in nature."  ERISA Opinion Letter 98-02A (March 6, 1998).  However, several courts

10  have attempted to answer the question, the majority of which have concluded that the plans

11  at issue were not subject to ERISA, primarily because they found that plan payments made

12  after retirement were merely "incidental" to the goal of providing current compensation,

13  and/or that providing for retirement was not the purpose of the plan.

14         The Ninth Circuit has not spoken on the issue.  However, in *Murphy v. Inexco Oil

15  Co.*, the Fifth Circuit reasoned that an employer's bonus program was not an ERISA plan

16  because it "was evidently designed to provide current rather than retirement income to

17  Inexco's employees."  611 F.2d 570, 575-76 (5th Cir. 1980).  In *Murphy*, the defendant

18  company gave bonuses to certain key employees, including the plaintiff, the president of

19  the company, by assigning a specific royalty interest in a drilling prospect it planned to

20  develop.  *Id.*  Each employee was given participation units, or rights to receive a fractional

21  portion of any proceeds that might thereafter accrue from the designated project.  *Id.* at

22  572.  The plaintiff claimed that this bonus plan violated ERISA. The district court dismissed

23  the case for lack of subject matter jurisdiction on the grounds that the bonus plan was not

24  subject to ERISA.  *Id.* at 570.

25         The Fifth Circuit agreed that the plan was not a pension plan, but instead provided

26  current income.  *Id.*  It found significant the fact that contributions were discretionary, given

27  in recognition of special service, awarded in addition to regular compensation, and did not

28

United States District Court
For the Northern District of California

1    result in the deferral of income. *Id.* The Fifth Circuit further concluded that the mere fact

2    that some payments under a plan may be made after an employee has retired or has left

3    the company does not result in ERISA coverage by statutory definition. *Id.* at 576; *see also*

4    *McKinsey v. Sentry Ins.*, 986 F.2d 401, 405-406 (10th Cir. 1993) (concluding an employee

5    benefit plan that provided an employee with an account for bonus allocations subject to a

6    vesting schedule did not constitute an ERISA plan, because the plan permitted an

7    employee to withdraw the vested portion of allocations at any time during the course of

8    employment and did not systematically defer payment to termination)**.**

9        Similarly, in *Oatway*, the Third Circuit held that where stock options provided under a

10   stock option incentive plan were discretionary, given in recognition of special service, and

11   awarded in addition to an employee's regular compensation – and only incidentally

12   provided retirement income – the plan was not an ERISA pension plan. 325 F.3d at 188-

13   89. The *Oatway* court noted that the issue was one of first impression for the circuit, but

14   that the courts that had addressed the issue "ha[d] uniformly held that an incentive stock

15   option plan is not an ERISA plan." *Id.*

16       The Third Circuit agreed with the Fifth Circuit's decision in *Murphy* in affirming the

17   district court's decision. *Id.* (discussing *Murphy*, 611 F.2d at 575-76).   It noted that the plan

18   at issue was not an employee pension benefit plan under ERISA because it was not

19   created for the purpose of providing retirement income, but rather for encouraging

20   employees to improve their performance. *Id.* It further agreed that the *Oatway* plaintiff's

21   post-retirement payments under the plan were incidental to the goal of providing current

22   compensation. *Id.*

23       Likewise, in *Emmeneger v. Bull Moose Tube Co.,* the Eighth Circuit held that a stock

24   plan was not covered by ERISA because it constituted an exempted bonus plan.  197 F.3d

25   929, 933-34 (8th Cir. 1999). *Emmeneger* involved a phantom stock plan that allowed

26   participants to redeem shares of phantom stock either for the stock's book value or for a

27   higher redemption value based on the employer's earnings performance. *Id.* The plan

28

United States District Court
For the Northern District of California

1    allowed vested participants to redeem their shares for full value at any time while still

2    employed.  *Id.* There was no indication that plan redemptions were in practice regularly

3    deferred.  *Id.*  Although a participant could postpone redemption of his phantom shares

4    until termination or retirement, this deferral was strictly at the option of the participant.  *Id.*

5        The Eighth Circuit focused on several aspects of the stock plan, including: (1) the

6    stated purpose of the plan; (2) how the redemption value of the plan's shares was

7    calculated; (3) when the shares vested; and (4) what events triggered redemption of the

8    shares.  *Id.* at 931-32. The court found that the plan set up a "classic" bonus situation:

9    "reward (higher cash value) for superior performance (higher corporate earnings)."  *Id.* at

10   933.  Additionally, after looking at both the express terms and the surrounding

11   circumstances of the plan, the court found that the "shares" in the stock plan were not

12   systematically deferred to termination or so as to provide retirement income.  *Id.*

13       The district courts that have confronted similar issues have reached conclusions in

14   line with those of the Third, Fifth, Eighth, and Tenth Circuits, discussed above.   In *Roderick*

15   *v. Mazzetti & Assoc.*, a judge on this court agreed that a stock option plan was not a

16   pension plan under ERISA.  2004 WL 2554453 (N.D. Cal. 2004).  In *Roderick*, the plaintiff

17   employee owned twenty shares of the defendant company's stock subject to an agreement

18   by which select employees were invited to purchase shares of company stock using their

19   own income from wages, bonuses, or other employee assets.  *Id.* at *7.  The plan,

20   however, required the plaintiff to sell the shares back to the defendant upon retirement or

21   termination.  *Id.* at *1-2. Plaintiff was terminated and the parties disagreed on the stock

22   value.  *Id.* at *1.

23       The *Roderick* plaintiff argued that the plan constituted a de facto employee pension

24   plan and was noncompliant with ERISA's statutory protections.  *Id.* at *6.  He argued that in

25   determining whether the plan was covered by ERISA, the court should apply the *Donovan*

26   test, or look to the "surrounding circumstances."  *Id.*  The court, however, found that it was

27   unnecessary to apply the *Donovan* test, instead concluding the stock plan at issue in

28

28

United States District Court

For the Northern District of California

*Roderick* did not satisfy ERISA's threshold statutory requirement - that it have been established for the *purpose* of retirement income security.  *Id.* at *7-8.

The court held that the plaintiff's ownership of the stock did not qualify as an ERISA plan because "ownership of the stocks was not deferred in any way; it was individualized, immediate, and fully alienable among authorized shareholders."  *Id.* at *8.  Additionally, although the plaintiff's purchase of the stock "may have been personally intended as retirement security, the company's purpose in arranging the sale of stock . . . was simply capital accumulation and ownership control."  *Id.*  The stock plan "was not for the sake of retirement security, though it may have had that incidental effect."  *Id.*

The *Roderick* court then compared the case to *Oatway* and *Murphy*, in concluding that the stock plan at issue did "not satisfy the statutory language and purpose of ERISA."  *Id.* at *9.  As a result, the court held that it need not reach the specific *Donovan* factors for determining whether the formal characteristics of the arrangement constituted a "plan, fund, or program" that was sufficiently "established or maintained" so as to fall within ERISA's coverage.  *Id.*

Similarly, in the two cases relied upon by the bankruptcy court below, *Lafian v. Electr. Data Systems Corp.*, 856 F.Supp. 339 (D. Mich. 1994), and *International Paper Company v. Suwyn*, 978 F.Supp. 506 (S.D.N.Y. 1997), the district courts held that stock option plans were not pension plans governed by ERISA because the purpose of the plans was not to provide retirement benefits.  In *Lafian*, the defendant employer operated a stock purchase plan that provided a one-time opportunity for employees to buy employer stock at a significant discount, vesting over a nine-year period and with restrictions on the sale of the vested stock.  836 F.Supp. at 340-41.

The court held that the stock program was offered as an incentive for transferring employees, and constituted "a bonus program that was not specifically designed to provide retirement income . . . [nor to] systemically defer income past termination of employment," despite the fact that some employees received benefits beyond termination.  *Id.* at 345.

**United States District Court**

For the Northern District of California

1    The *Lafian* court concluded that although some employees might retire before the vesting

2    schedule ended, those circumstances did not "change the fact that the program, as a

3    whole, largely provided for additional income to employees during the course of their

4    employment." *Id.*

5         In *Suwyn*, the other case relied on by the bankruptcy court, the employer operated a

6    stock option plan (like this case, referred to as the "long term incentive compensation plan"

7    or "LTICP") that authorized grants of stock options to certain employees.  978 F. Supp. at

8    508-09. Under the plan, half of the shares were restricted until the employee died, became

9    permanently disabled, retired after the age of 62, or reached the third anniversary of the

10   date of the determination of the award.  *Id.*  Despite this restriction, the *Suwyn* court

11   dismissed the employee's ERISA claims and held that the stock option plan was not an

12   employee pension benefit plan under ERISA because the purpose of the plan was not to

13   provide retirement income.  *Id.* at 510.  The court held:

14        In the absence of any evidence that the plan was designed 'primarily for the
         purpose of providing retirement income,' the plan's consequential effect of
15        permitting some employees to enjoy after retirement the benefits of [the plan]
         that were paid before retirement is merely incidental to the goal of providing
16        current compensation.

17   *Id.*; *see also Hahn v. National Westminster Bank*, 99 F.Supp.2d 275 (E.D.N.Y. 2000)

18   (holding that stock plan designed to provide key employees with financial incentives for

19   improving long-term performance was not an ERISA plan, even though it was possible that

20   the benefits would provide income during retirement); *Killian v. McCulloch*, 850 F.Supp.

21   1239, 1245-46 (D. Penn. 1994) (holding that a bonus plan that provided employees with

22   benefits -stock bonus plus interest - regardless of whether they retired was not an ERISA

23   pension plan because the plan's sole purpose was to provide employees with an incentive

24   to remain with the company, and the fact that benefits could have been paid after

25   termination due to retirement, death or disability, was only incidental to the plan).

26        **2.    Parties' Arguments/ Bankruptcy Court's Ruling**

27        In her trial brief below, Segovia argued that the LTICP was "an unintended and

28

United States District Court

For the Northern District of California

1   informal" pension benefit plan under ERISA based on the "surrounding circumstances."

2   First, she asserted that the LTICP's "intended benefits" are included in the plan at section

3   10, which describes the stock options that she received from Wells Fargo.  Second,

4   Segovia contended that the "class of beneficiaries" is described in the plan at section five,

5   which describes participation in the plan.  She asserted that she was an employee from

6   February 1, 1974 through October 5, 2005, when she accrued her "80 points," as described

7   by the plan in section 2.1(y).  Third, Segovia argued that the "source of funding" for the

8   LTICP is described at section four, "shares available under the plan."  Additionally, Segovia

9   asserted that the "procedure for receiving benefits" under the LTICP is described in section

10  three, "administration," section 10, "options," and section 10.8(a) regarding the immediate

11  vesting of options upon retirement.  Finally, Segovia argued that by undertaking an ongoing

12  administrative obligation to administer stock options for "as long as [it] keep[s] granting

13  options," Wells Fargo maintained the LTICP as a pension plan subject to ERISA.  *See*

14  Appellee's E.R., Exh. 10 at 51.

15          In its trial brief, the trustee responded without elaboration that Segovia's stock

16  options were not implicated at all by ERISA.

17          In its June 10, 2008 order, the bankruptcy court simply ruled that the LTICP is not a

18  retirement plan under ERISA "because it does not either provide retirement benefits or

19  defer income within the meaning of 29 U.S.C. § 1002(2)(A)."  It cited to the district courts'

20  decisions in *Suwyn* and *Lafian* in support.  *Lafian*, 856 F.Supp. at 339; *Suwyn*, 978 F.Supp.

21  at 506.

22          In her brief before this court, Segovia reiterates the same arguments that she made

23  in her trial brief before the bankruptcy court, with the additional argument that this case is

24  distinguishable from the district court cases, *Suwyn* and *Lafian*, relied on by the bankruptcy

25  court.  *Lafian*, 856 F.Supp. at 339; *Suwyn*, 978 F.Supp. at 506.

26          In opposition, the trustee contends that the bankruptcy court correctly ruled that the

27  LTICP is not a pension benefit plan under ERISA.  First, it notes that several Wells Fargo

28

United States District Court

For the Northern District of California

1    sources confirm that it did not intend for the LTICP to be an ERISA plan.  Second, the

2    trustee argues that the LTICP does not promise retirement benefits or defer income to

3    retirement or beyond.  She asserts that the fact that the LTICP sets forth a time period for

4    exercising an unexercised stock option in the event of death, permanent disability, or

5    retirement does not change this fact.  She further contends that Segovia's pre-retirement

6    exercise of the stock options, in addition to the pre-retirement vesting of the unexercised

7    options, demonstrates that the LTICP does not defer income to retirement periods.

8        The trustee also counters that contrary to Segovia's position, the court should not

9    consider the "surrounding circumstances," or *Donovan* test, in determining whether the

10   LTICP constitutes an ERISA pension plan.  The trustee notes that the Ninth Circuit has

11   limited such an inquiry to cases "where a formal plan is absent and the question remains

12   whether a de facto plan has been created."  *Cinelli,* 61 F.3d at 1441.  She asserts that,

13   here, there is a formal plan, the LTICP, which unambiguously sets forth its purpose.

14            **3.      Analysis**

15       "The existence of an ERISA plan is a question of fact, to be answered in light of all

16   the surrounding facts and circumstances from the point of view of a reasonable person."

17   *Kennedy v. Allied Mutual Insur. Co.*, 952 F.2d 262, 266 (9th Cir. 1991).  As set forth above,

18   "[a] factual determination is clearly erroneous if the appellate court, after reviewing the

19   record, has a firm and definite conviction that a mistake has been committed."  *Wall Street*,

20   344 B.R. at 99 (9th Cir. BAP 2006) (citing *Anderson*, 470 U.S. at 573).

21       Initially, the court notes that Segovia's ERISA-related arguments raise a factual

22   dispute regarding the date of her retirement from Wells Fargo.  The issue was argued in the

23   papers and at the hearing before the bankruptcy court, but was not resolved by the

24   bankruptcy court.  That dispute is relevant to Segovia's argument that her retirement

25   triggered the immediate vesting of her remaining stock options under the LTICP.

26       The record reflects that Segovia qualified for retirement under the LTICP section

27   2.1(y)'s "80 point" rule, also referred to by the parties as the "Rule of 80," on February 1,

28   2005.  Accordingly, there is no dispute that when Segovia exercised some of her stock

**United States District Court**
For the Northern District of California

options pre-petition in 2002 and 2004, she did not qualify for retirement, but was able to exercise the options nevertheless.  There is also no dispute that Segovia did not actually retire on February 1, 2005, the day she became eligible for retirement.  Finally, there is no dispute that all of Segovia's stock options had not vested as of February 1, 2005, but that the remaining unexercised stock options vested by February 25, 2006.  Appellee's E.R., Exh. 4, at WF00137.

Although not entirely clear, the court believes that Segovia's position is that she "retired" on October 5, 2005, the date that Wells Fargo notified her that her position would be eliminated.  She thus appears to argue that the unvested stock options (those that did not vest until February 25, 2006) immediately vested ahead of schedule on October 5, 2005, due to her alleged retirement.  The trustee, however, counters that Segovia did not "retire" until March 3, 2007, at which time all of her unexercised stock options would have vested.

Because the bankruptcy court did not make any findings on the issue, this court considers it *de novo*.  Based on the testimony and other record evidence, the court finds that Segovia did not "retire" until March 3, 2007.  Segovia simply received notice of the elimination of her position on October 5, 2005.  That elimination didn't even become effective until December 3, 2005, so Segovia would have at a minimum remained an employee until then.  However, all of the evidence, including testimony from Wells Fargo executives Roe and Morrow, indicates that Segovia did not retire until March 3, 2007, when her "continuation of leave" expired.  Accordingly, the court finds that Segovia retired on March 3, 2007*, after* all of her unexercised options vested.

Turning then to the LTICP, the court finds that the plan is not covered by ERISA, 29 U.S.C. §1002(2), because it does not, either expressly, or based on the surrounding circumstances, possess a retirement purpose, nor does it defer income as required under the statute.  First, the plan's purpose is evident and express.  Its stated purposes are: (1) to "motivate key employees to produce a superior return;" and (2) "to facilitate recruiting and retaining talented talented executives."  Appellee's E.R., Exh. 1.  The stated purposes are

33

United States District Court
For the Northern District of California

likewise consistent with the testimony of Wells Fargo's executives, Roe and Morrow. The plan in the case is therefore like that in *Oatway*, because it was created *not* for the purpose of providing retirement income, but rather as an incentive plan designed to provide a financial incentive for employees to remain with Wells Fargo and improve their performance there. 325 F.3d at 188-89.

Furthermore, the mere fact that previously unexercised and unvested stock options might have vested upon Segovia's retirement - although the court concludes that was not actually the case here – thus resulting in payment to Segovia after she left Wells Fargo, does not result in ERISA coverage*,* given that Segovia was able, under the LTICP, to withdraw the vested portion of her stock options at any time, as she did, and was not required to systematically defer the withdrawal or payment until her retirement. *See Murphy*, 611 F.2d at 576; *see also Lafian*, 856 F.Supp. at 339*, McKinsey*, 986 F.2d at 405.

In sum, the court finds that even if the LTICP may have under some circumstances incidentally provided for retirement, or allowed participants to defer income, that was not its principal purpose. For that reason alone, the plan is not covered by ERISA.

The result is the same even if the court were to consider the "surrounding circumstances" as well. There is no evidence that Wells Fargo promoted the LTICP as a retirement plan; in fact, all of the evidence is to the contrary. Moreover, for the reasons stated above, there is also no evidence that Wells Fargo administered the plan in a way that had the effect of providing retirement income to participants. The plan provisions cited by Segovia do not persuade the court otherwise. Finally, even though Segovia herself did not, the fact that other LTICP participants *may have chosen* to postpone redemption of the vested stock options until retirement, does not convert the LTICP to a retirement plan. *See Emmeneger*, 197 F.3d at 933-34 .[7] There is nothing in the plan itself, or in the record before this court, which suggests that the LTICP systematically provided for deferred income and/or retirement benefits.

---

[7]The court, however, notes that Segovia has not presented any evidence that this occurred.

34

United States District Court

For the Northern District of California

1   For these reasons, the court concludes that the bankruptcy court's finding that the

2   LTICP does not constitute an ERISA plan was not clearly erroneous.[8]

3       **B.    Second Inquiry under 541(c)(2)**

4       Because the court concludes that the LTICP does not constitute an ERISA pension

5   plan, it is unnecessary for the court to consider whether the non-transferability clause is

6   enforceable, thus excluding Segovia's stock option benefits from the bankruptcy estate

7   under Bankruptcy Code § 541(c)(2).

8       It is therefore also unnecessary for the court to reach several related arguments

9   raised by Segovia, including: (1) whether the plan's "non-transferability of rights" or anti-

10  alienation provision is not only enforceable for federal income tax qualification purposes,

11  but also for ERISA purposes; (2) whether the bankruptcy court erred by failing to address

12  Segovia's argument that the original and amended stipulations between Wells Fargo and

13  the trustee amount to an admission that the LTICP's "non-transferability of rights" provision

14  is enforceable for both taxation and ERISA purposes; and (3) whether the bankruptcy court

15  erred by essentially using a pre-*Patterson v. Schumate* analysis of the LTICP.  These

16  arguments are mooted by the court's conclusion that the LTICP is not an ERISA plan.

17      **C.    Additional ERISA Arguments**

18      Segovia also raises several other ERISA-related arguments that are either mooted

19  by this court's conclusion that the LTICP is not an ERISA plan, are without merit, and/or

20  which constitute inappropriate arguments on appeal.  In her SOI, Segovia asked whether

21  the bankruptcy court erred in failing to apply legal standards and criteria "used by federal

22  district courts" in determining whether a plan is subject to ERISA, and also to interpret

23  provisions of an ERISA plan.  The court will not spend much time on this issue, suffice it to

24  note that, unlike United States Supreme Court and Ninth Circuit decisions, district court

25  decisions are not binding on this court.   That said, the bankruptcy court did indeed rely on

26  *two* "federal district court" decisions in concluding that the LTICP was not subject to ERISA

27  _____

28      [8]The court further notes that had it reviewed the issue de novo, it would have reached
    the same conclusion.

United States District Court

For the Northern District of California

- one from the Southern District of New York, and the other from the Eastern District of Michigan.  *See Suwyn*, 978 F.Supp. at 506; *Lafian*, 856 F.Supp. at 339.  Additionally, the court notes that Segovia herself failed to identify controlling Ninth Circuit ERISA legal standards for this court, which the court nevertheless has set forth above.

Segovia also raised an issue in her SOI as to whether "the bankruptcy court or the trustee had met their burden of proof that the LTICP is not subject to ERISA."  First, the court notes that it is *not* the trial court itself that has the burden.  Second, between the parties, it is actually *Segovia* who has the burden to prove that the stock options are excludable from the estate under § 541(c)(2).  *See Rhiel v. Adams (In re Adams)*, 302 B.R. 535, 540 (6th Cir. BAP 2003) ("debtors bear the burden of demonstrating that all the requirements of § 541(c)(2) have been met before the property in question can be effectively excluded from the estate"); *see also* 3A Bankr. Service L. Ed. § 29:610, Burden of Proof (2009 ed.); *In re Lowenschuss*, 202 B.R. 305, 313 (Bankr. D. Nev. 1996); *In re Switzer*, 146 B.R. 1 (Bankr. C.D. Cal. 1992);  *In re Leimbach*, 99 B.R. 796, 798 (Bankr. S.D. Ohio 1989).

Segovia's claim that she is entitled to equitable relief under ERISA § 502(a)(3) is mooted by the court's determination that the LTICP is not covered by ERISA.

Finally, in her SOI, Segovia also raised two policy issues, numbers 16 and 17, that were not raised below before the bankruptcy court, and which do not constitute appropriate issues on appeal.  Accordingly, the court declines to address those issues, neither of which is dispositive to any of the key issues on appeal.

**III.    Whether the LTICP Qualifies as a Spendthrift Trust under Bankruptcy Code § 541(c)(2)**

This issue relies on the same Bankruptcy Code provision as the ERISA issue above, section 541(c)(2).

**A.    Legal Standards/Background**

As noted, under Bankruptcy Code § 541(c)(2), an anti-alienation provision in a valid spendthrift trust created under state law is an enforceable "restriction on the transfer of a

United States District Court

For the Northern District of California

beneficial interest of the debtor" and thus serves to exclude the trust corpus from the bankruptcy estate. *In re Moses*, 167 F.3d 470, 473 (9th Cir. 1999) (citing *Patterson*, 504 U.S. at 757-58); *Snyder*, 343 F.3d at 1178.  Spendthrift trusts are a particular type of express trust.  Collier on Bankruptcy at § 541.11[2].  A spendthrift trust is "a trust that restrains voluntary and involuntary alienation of all or any of the beneficiaries' interests." *Id.* According to the Restatement, "if the terms of the trust provide that a beneficial interest shall not be transferable by the beneficiary or subject to claims of the beneficiary's creditors, the restraint on voluntary and involuntary alienation of the interest is valid." *Id.* (citing Restatement (Third) of Trusts § 58(1)(2003)).  If the trust does not have a spendthrift clause or the spendthrift provision is not valid under applicable law, every right of the debtor under the trust becomes property of the estate. *Id.*  However, despite the inclusion of a valid spendthrift clause, if the debtor has the power to amend or terminate the trust, the debtor's interest in the trust does become property of the estate. *Id.*

California law recognizes the validity of spendthrift trusts. *In re Moses*, 167 F.3d at 473; *see also In re Neuton*, 922 F.2d 1379 (9th Cir. 1990).  The key issue is whether the transfer restriction is enforceable under California law, which in turn, depends on the degree of the debtors' control over the trust res. *In re Atwood*, 259 B.R. 158, 162 (9th Cir. BAP 2001).  California law does not allow a participant with excessive control over his or her trust to shield that trust with an anti-alienation provision lacking true substance. *In re Moses*, 167 F.3d at 473.

Although it is unclear to the court why Segovia did not address the instant trust issue in her trial brief below, the trustee nevertheless addressed it in her trial brief, the bankruptcy court and the parties addressed the issue on the record at the hearing, and the bankruptcy court ruled on it in its written order.  In her trial brief, the trustee argued that the LTICP was not a trust.  She noted that Wells Fargo's compensation executive, Roe, testified that the non-transferability provision in the plan was not intended to create a spendthrift trust, but simply to limit the number and type of persons that the employer was required to deal with in the exercise of the stock options.  The trustee further noted a recent district court case in

United States District Court

For the Northern District of California

1    which the court found that the very plan, Wells Fargo's LTICP, was not a trust.  *Marshalls v.*

2    *Wells Capital Mngmt. Incorp.,* 2007 WL 4565164 (D. Or. 2007).

3        The trustee also argued that the stock options themselves were not trust property

4    but were instead a vested property right belonging to Segovia.  She noted that Segovia had

5    an unfettered ability to exercise the stock options and realize the proceeds therefrom,

6    which she did on several occasions prior to her bankruptcy filing.  Alternatively, even if the

7    LTICP could be considered a trust, the trustee argued that it is an invalid trust based on

8    Segovia's ability to access the trust's corpus.  The trustee argued that the LTICP did not

9    restrict Segovia's exercise of the options except to require that they be vested, and that

10   neither Wells Fargo nor the terms of the LTICP restrained Segovia from exercising them.

11       At the hearing, the bankruptcy court asserted that it was skeptical that the LTICP

12   constituted a valid spendthrift trust.  June 5, 2008 Transcripts, Appellant's E.R. at Exh. 19,

13   at 32-34.  It noted that a trust requires that there be property subject to the trust, that it be

14   given to a trustee to manage subject to certain duties, and that there be a beneficiary.  *Id.*

15   The court indicated that Segovia's stock options under the LTICP appeared to "be a pure

16   contractual right not subject to any kind of management."  *Id.*  It noted that there was "no

17   right here to have the shares be - to have the company be run in any such way; there's no

18   fiduciary duty to maintain the value of the shares."  *Id.*  The bankruptcy court stated that,

19   instead, "a participant has a contractual right to have shares issued for x dollars." *Id. at* 32.

20       Segovia argued in favor of a trust, asserting that the options hadn't really been under

21   her control because they had been entrusted to and maintained by her employer in an

22   ongoing administrative scheme.  Segovia disagreed that the administration of the plan was

23   "passive," as the bankruptcy court characterized it.

24       The court concluded on the record that it didn't

25   think [the LTICP] is a trust.  It's basically a contractual right.  It's not subjected
     to anybody's management and control with instructions and fiduciary duty to
26   maintain that property.  It's a right that will vary in value.  The fact that it's
     issued pursuant to a plan means nothing.  It's just an option.  And there's
27   nothing more here about this option which makes it a trust than any other
     option.  An option is not a trust.

28

United States District Court

For the Northern District of California

1    *Id.* at 33-34.

2    Subsequently, in the June 9, 2008 order the bankruptcy court, not surprisingly, held

3    that the LTICP was not a trust.  It found that the LTICP

4        does not call itself a trust.  Nor are there any employee assets managed
         under the LTICP.  The plan provides no assets other than contractual option
5        rights, which are exercised solely by the employee, and any stock purchases
         is then held and managed directly by the employee.  *See Marshall v. Wells*
6        *Capital Mngmt, Inc.*, 2007 WL 4565164 at *11-13 (D. Or. 2007).  Because the
         LTICP is not a trust, [] § 541(c)(2) does not apply.

7

8    As was the case with her trial brief below, Segovia has not really addressed the

9    issue in her briefs before this court.  This is in spite of the fact that, in her SOI, she stated

10   as one of her issues on appeal, "[w]hether the bankruptcy court erred in finding that the

11   LTICP is not a trust."  The only related argument that Segovia makes is that the bankruptcy

12   court erred in its citation to *Marshall*, 2007 WL 4565164 at 11-13, in concluding that the

13   LTICP is not a trust.

14   In her opposition brief, the trustee simply reiterates the bankruptcy court's holding

15   and asserts that the court correctly ruled that the LTICP was not a trust.  She further notes

16   Roe's deposition testimony, which she previously cited to in her trial brief before the

17   bankruptcy court.

18   **B.    Analysis**

19   This court reviews the bankruptcy court's determination as to whether the LTICP

20   constitutes a spendthrift trust excludable from Segovia's bankruptcy estate *de novo.  In re*

21   *Moses*, 167 F.3d at 473; *In re Atwood*, 259 B.R. at 160.

22   Before the court addresses whether, based on the LTICP's non-transferability

23   provision, the plan constitutes a valid *spendthrift* trust, the court must first consider whether

24   the LTICP constitutes a trust *at all*.  As noted above, Segovia has not expended much effort

25   in addressing this issue.  In fact, based on Segovia's opening brief, it actually appears that

26   Segovia's argument that the LTICP constitutes a "trust" hinges entirely on her prior

27   arguments that the plan is covered by ERISA or constitutes a private retirement plan under

28   California law.  *See* opening br. at 22.  In other words, Segovia argues that the LTICP is a

United States District Court

For the Northern District of California

1    trust *because* it is either an ERISA plan or a private retirement plan.  *See id.*  Segovia does

2    not advance any other reasons why the stock option agreement should be considered a

3    trust.

4            This court, however, has already concluded that the LTICP does not constitute a

5    private retirement plan under California law or a pension plan under ERISA, and therefore it

6    cannot constitute a trust based simply on one of those two characterizations.

7    Nevertheless, affording Segovia the benefit of the doubt and assuming that she did not

8    intend to limit the issue as narrowly as set forth above, the question for the court then

9    becomes whether the LTICP, more akin to a stock option incentive plan, constitutes a trust

10   under California law.

11           Other than citing to *Marshall*, and Wells Fargo executive, Roe's testimony that Wells

12   Fargo did not intend to create a spendthrift trust, the trustee has not offered much

13   assistance to the court, either.  *Marshall* is somewhat instructive in that it involved the very

14   LTICP currently before this court.  *Marshall*, 2007 WL 4565164 at 11-13.  However, in

15   *Marshall*, the district court concluded that the LTICP did not constitute a trust under Oregon

16   law, not California law.  *Id.*

17           In *Marshall*, the plaintiffs were former Wells Fargo employees who were granted

18   stock options under the LTICP.  *Id.* at *1.  Plaintiffs voluntarily resigned from their

19   employment, and at the time of their resignation owned fully vested unexercised stock

20   options under the plan.  Approximately three weeks after their resignation, plaintiffs

21   submitted the forms required to exercise their stock options.  Wells Fargo, however, denied

22   the request, and informed plaintiffs that their stock options had been "cancelled."  *Id.*

23           Plaintiffs filed a lawsuit against Wells Fargo, raising numerous claims, including a

24   claim for breach of fiduciary duty.  *Id.* at *2.  Plaintiffs alleged that "by virtue of its position of

25   trust and reservation of discretion under [the LTICP], Wells Fargo owed [them] a fiduciary

26   duty in administering the LTICP."  *Id.* at *11.  Wells Fargo moved to dismiss the claim on

27   the basis that there was no "special relationship" between the parties under Oregon law.

28   *Id.* at *12.  Plaintiffs responded that the stock option grant under the LTICP created a

United States District Court

For the Northern District of California

1    trustee-beneficiary relationship.  Plaintiffs further argued that the district court should treat

2    the LTICP similar to other benefit plans, like a 401(k) plan, which under Oregon law, had

3    been deemed to create a fiduciary relationship between an employer and an employee.  *Id.*

4    at *13.

5    The court rejected plaintiffs' arguments, holding that the LTICP did not create a trust

6    under Oregon law.  *Id.*  It implied that the LTICP simply created a contractual promise to

7    convey property, which was not sufficient to create a trust, and found that

8    > No part of the [LTICP] suggests that Wells Fargo had any obligation to do
  > anything in particular with the shares of stock that it made available to
9    > employees.  No facts show that Wells Fargo had any express duty to act in
  > plaintiffs' interests.  Rather the [LTICP] expressly provides that its primary
10   > purpose is to produce a superior return to stockholders.

11   *Id.*  Relying on a bankruptcy court decision, the district court concluded that like other stock

12   option agreements, the LTICP constituted a contract subject to a contingency as opposed

13   to a trustee-beneficiary relationship.  *Id.* (citing *DeNadai v. Preferred Capital Mkts.*, 272

14   B.R. 21, 34 (Bankr. D. Mass. 2001)).

15   The district court further refused to equate the LTICP with Wells Fargo's 401(k) plan

16   for purposes of fiduciary duties, finding that "[d]ifferences in the nature of the benefits

17   offered by a 401 plan and [a] stock option plan counsel against finding a fiduciary duty in

18   the latter simply because one exists in the former."  *Id.* at *14.  The court reasoned that a

19   stock option agreement like the LTICP creates "only a right for the employee to act," and

20   "nothing more."  *Id.*  It noted that even if the employees' options had vested by virtue of

21   continuous employment for a designated period of time, "there still is no asset [for Wells

22   Fargo] to manage or protect until, and most importantly *unless*, the employee *exercises* the

23   option."  *Id.*  The court concluded that there is no asset or trust res for Wells Fargo to

24   manage "[b]ecause of the contingency of exercise."  *Id.*

25   California law does not dictate a different result.  Under California law, a trust is

26   created by a manifestation of intention of the settlor to create a trust, trust property, a lawful

27   trust purpose, and an identifiable beneficiary.  *California-Nevada Annual Conference of*

28   *United Methodist Church v. St. Luke's United Methodist Church*, 121 Cal.App.4th 754, 764,

United States District Court

For the Northern District of California

767-68 (Cal. Ct. App. 2004).  It is a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it.  *Id.* at 767-68.

California courts have held that a pension plan offered by an employer creates two relationships: (1) a contractual relationship between the employer and the employee; and (2) a trust relationship between pensioner-beneficiaries and the trustees of pension funds who administer retirement benefits.  *Lix v. Edwards* 82 Cal.App.3d 573, 578 (Cal. Ct. App. 1978); *Hannon Engineering, Inc. v. Reim*, 126 Cal.App.3d 415 (Cal. Ct. App. 1981).  The trustees must exercise their fiduciary duties in good faith and must deal fairly with the pensioner-beneficiaries.  *Id.*

However, not *all* employee benefit plans constitute a trust under California law.  For example, an employer's deferred compensation plan is not a trust where there is no evidence that the employer and plan participants intended to create a trust.  *See Herrick v. State of California*, 149 Cal.App.3d 156, 161 (Cal. Ct. App. 1983).  Just because a plan participant may expect the employer to make investments under a deferred compensation plan in good faith does not mean that there is also a trust, or that the employer has accepted the role of trustee.  *Id.* ("[n]early all contracts embrace a certain degree of 'personal confidence,' but it does not follow that every contract creates a trust").

Like *Marshall,* but based on California law, the court concludes that the LTICP did not create a trust.  There is no evidence of any intent to create a trust; in fact, the evidence is to the contrary.  Nor is Wells Fargo managing the LTICP as a trust.  Segovia and other participants are free to exercise the stock options, once vested, at will.  Accordingly, it is the participants who "manage" their options.

However, even if the LTICP could be considered a trust, the court nevertheless concludes that it is not a valid spendthrift trust.  California law "prevent[s] individuals from placing their property beyond the reach of their creditors while at the same time still reaping the bounties of such property."  *In re Cutter*, 398 B.R. 6, 20-22 (9th Cir. BAP 2008) (citing

United States District Court

For the Northern District of California

1  *Nelson v. California Trust Co.*, 202 P.2d 1021, 1021 (Cal. 1949) (noting that "[i]t is against

2  public policy to permit a man to tie up his property in such a way that he can enjoy it but

3  prevent his creditors from reaching it")).

4          Here, Segovia's "dominion and control," as demonstrated by her pre-petition

5  exercises of the options was sufficient to destroy its spendthrift nature.  This was not simply

6  a case where Segovia borrowed against the plan, repaying the loans with interest.  *See In*

7  *re Kincaid*, 917 F.2d 1162, 1168 (9th Cir. 1990).  Instead, there were essentially no

8  restrictions on her ability to access her vested stock options.   For example, the LTICP did

9  not contain any type of "hardship provision," which required a showing of need before

10  Segovia exercised the options.  *See id.*  Nor does the LTICP limit Segovia's distributions to

11  retirement, disability, or death.  *See In re Moses*, 167 F.3d at 473.  Because Segovia "had

12  access to potentially all of the trust's assets and income to maintain [her] standard of living,

13  and possessed the power to 'invade' the corpus of the trust" for essentially any reason, the

14  LTICP's non-transferability provision does not convert the stock options under the LTICP

15  into a spendthrift trust excludable under Bankruptcy Code § 541(c)(2).  *See In re Cutter*,

16  398 B.R. at 20-22.  Accordingly, the stock options under the LTICP remain property of the

17  bankruptcy estate under § 541(a)(1).

18  **IV.    Other Related Issues**

19          As noted, in her SOI and opening brief, Segovia raised issues regarding whether the

20  LTICP stock options were "double-insulated," and also whether ERISA preempts

21  California's Code of Civil Procedure § 704.115, governing private retirement plans.

22  The court is understandably unclear as to Segovia's argument regarding the "double

23  insulation" issue since she failed to address the issue in her briefs on appeal.  However,

24  having reviewed her trial brief, the court was able to ascertain that Segovia is arguing

25  simply that the LTICP is *both* an ERISA plan and a private retirement plan.  She asserts

26  that to the extent it is both, ERISA would preempt California's Code of Civil Procedure §

27  704.115.  Accordingly, the "double insulation" issue adds nothing new to the issues already

28  addressed above.  Because the court finds that the LTICP is *neither* an ERISA plan nor a

43

private retirement plan, the argument fails.

As for the preemption issue, Segovia argues simply in her opening brief that "[o]nce the LTICP is determined to be an exempt private retirement plan under California law, it is then nevertheless preempted and excluded pursuant to 11 U.S.C. § 541(c)(2) by the LTICP's valid and enforceable anti-alienation provision under ERISA."  Opening Br. at 8. Again, because the court finds that the LTICP is *neither* an ERISA plan nor a private retirement plan, the argument fails as well.

**CONCLUSION**

For the reasons set forth above, the court AFFIRMS the judgment of the bankruptcy court sustaining Wells Fargo's objections to Segovia's claimed exemptions and/or exclusions from the bankruptcy estate.

**IT IS SO ORDERED.**

Dated: March 30, 2009

_____
PHYLLIS J. HAMILTON
United States District Judge

United States District Court
For the Northern District of California

44